# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BIT9, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:09-cv-11814 |
| v. ) | |
| ) | |
| VEUS, d. o. o., and ) | |
| MARIO VUKSAN, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT AND JURY DEMAND

1.  Plaintiff, Bit9, Inc. ("Bit9") is a software company based in Waltham. The pioneer and leader in Enterprise Application Whitelisting, the company's patented solutions ensure that only trusted and authorized applications are allowed to run on Windows computers, eliminating the risk caused by malicious, illegal and unauthorized software.

2.  Defendant Mario Vuksan ("Mario") was an employee of Bit9 who was involved in developing some of Bit9's technology. In approximately 2006, Mario convinced Bit9 to engage software developers located in Croatia. He further convinced Bit9 that it should engage those developers through VEUS, d.o.o. ("VEUS"), a Croatian entity owned and controlled by Mario's father Kuzman Vuksan ("Kuzman"), for Bit9's administrative convenience.

3.  It was expressly understood and agreed that VEUS would charge Bit9 only its actual costs of providing the programming services, without any markup or additional compensation. It was also expressly understood and agreed, and evidenced in writing, that all of the programming work conducted by the developers in Croatia would belong solely and exclusively to Bit9.

4.      Bit9 recently discovered that VEUS, with Mario's knowledge, had been secretly overcharging Bit9 for the development services it had been providing.  When Bit9 confronted VEUS with this discovery and informed VEUS that it intended to end the parties' relationship, VEUS claimed, for the first time and contrary to the parties' express agreement, that VEUS owned the software code that the Croatian developers had created expressly for Bit9, that had already been delivered to Bit9, and for which VEUS had already been paid – and, indeed, overpaid.

5.      Bit9 now brings this Complaint to recover the damages that it has suffered as a result of VEUS' fraud and breach of contract and Mario's breaches of his employment obligations and fiduciary duties.  Bit9 also asks this Court to enter a declaratory judgment that it owns, solely and exclusively, all rights, title, and interest in the software code at issue.

**PARTIES**

6.      Plaintiff Bit9, Inc. is a Delaware corporation with a principal place of business at 266 Second Avenue, Waltham, Massachusetts.

7.      Defendant VEUS, d.o.o. is an entity organized under the laws of Croatia having a principal place of business at Gamboseva 36, Zagreb 10000, Croatia.

8.      Defendant Mario Vuksan is an individual residing at, upon information and belief, 169 Monsignor O'Brien Highway, Apt #802, Cambridge, Massachusetts.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over Bit9's claim for declaratory relief pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) because they arise under the copyright laws of the United States, and 28 U.S.C. 2201 because there is an actual controversy concerning the ownership of the copyright in the software code at issue.

10. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Bit9's claims arising under Massachusetts law because these claims are so related to Bit9's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

11. This Court has diversity jurisdiction over Bit9's claims against VEUS pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $100,000 and the controversy is between a domestic corporation and a foreign entity.

12. Mario Vuksan is subject to the personal jurisdiction of this Court because he resides and may be found here, because he transacts business here, and because Bit9's claims against him arise from an employment relationship performed here and governed by Massachusetts law.

13. Defendant VEUS is subject to the personal jurisdiction of this Court because it contracted with Bit9 to supply goods and services and otherwise transact business in this District, and because VEUS' tortious and fraudulent acts occurred within this District and have caused harm to Bit9 within this District.

14. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400 because (a) a substantial part of the wrongful conduct of the defendants occurred in the District of Massachusetts, and (b) defendant Mario Vuksan is subject to personal jurisdiction in the District of Massachusetts and there is no other district in which this case could be brought.

## **FACTS**

15. Founded in 2002, Bit9 is the pioneer and leader in enterprise application whitelisting. It has been awarded a prestigious research grant in 2003 from the National Institute

of Standards and Technology-Advanced Technology Program (NIST ATP) to conduct the research that is now at the core of its application whitelisting solutions.

16. Unlike traditional, reactive endpoint security solutions that try to identify and prevent the installation of unauthorized software, the Bit9 Parity security solution ("Parity") takes the opposite approach: it is designed to allow only trusted and authorized – i.e., "whitelisted" – software to run on a computer.

17. Bit9 Parity leverages the Bit9 Global Software Registry ("GSR"). GSR is a proprietary database in which information about an enormous variety of software programs has been creatively selected, compiled, arranged, and presented.

18. Bit9's solutions are used in a wide variety of industries, including retail, financial services, healthcare, e-commerce, education, and government agencies.

19. The copyrights in all versions of Parity and GSR have been duly registered by Bit9 and the United States Copyright Office is in the process of assigning them registration numbers.

<u>Bit9 Hires Mario Vuksan To Work in Cambridge, Massachusetts</u>

20. From approximately 2005 through 2008, Mario was employed by Bit9 in Bit9's facilities in Cambridge, Massachusetts.

21. As a Bit9 employee in 2005, Mario was involved in the creation of the database that would become Bit9's GSR. He began to develop GSR prototypes in approximately August 2005. At that time, Mario was the only Bit9 employee working on the project.

22. In October 2005, Bit9 hired another employee, Davor Roglic, to work on developing the GSR with Mario in Cambridge.

23. Bit9's GSR was initially ready and released for use in approximately January 2006. The most current release was in June 2009.

24. Bit9 Parity was also developed entirely by Bit9 employees at Bit9's facilities in Cambridge. The first publicly-released version of Parity, Version 1.3, was released in March 2005. The most current release is Parity 5.0.

25. At all times between its creation and July 2007, all GSR and Parity computer source code, with the exception of one isolated GSR component, was created by Bit9 employees in the course of their employment and maintained and stored in Bit9's source code repository in Cambridge, Massachusetts.

<u>At Mario's Suggestion, Bit9 Engages Croatian Developers through VEUS</u>

26. In 2006, at Mario's suggestion, Bit9 began to engage the services of certain software developers located in Croatia (the "Croatian Developers") to help maintain, update, and troubleshoot Bit9's GSR.

27. No Croatian Developers performed work on Parity before March 2007. All work on Parity prior to that time was performed directly by Bit9 employees in the course of their employment.

28. After March 2007, all work performed by Croatian Developers on Parity was derivative in nature and involved only modification and updating of the product.

29. It was expressly understood and agreed, and evidenced in writing, that all of the work performed by the Croatian Developers and the intellectual property rights in such work belonged solely and exclusively to Bit9.

30. To facilitate Bit9's use of Croatian Developers, Mario suggested that his father, Kuzman Vuksan, could engage the developers through his company, VEUS, in Croatia. Prior to

5

engaging the programmers for the benefit of Bit9, VEUS had engaged in providing services to the railroad industry in Croatia.

31.     VEUS and Bit9 agreed that VEUS would engage the Croatian Developers, who would provide services solely to Bit9.

32.     VEUS and Bit9 further agreed that the relationship with VEUS would be a pass-through arrangement, i.e., VEUS would charge Bit9 only for the actual cost of the Croatian Developers' fully-loaded compensation and actual expenses relating to those programmers. VEUS never requested, and Bit9 never agreed to pay, any direct compensation or mark-up to VEUS.

33.     From 2006 through the end of 2008, VEUS periodically submitted invoices to Bit9 for the services provided by the Croatian Developers, for any computer or other equipment bought to support their work, and for any overhead costs associated with the programmers. VEUS and Mario represented that the invoices did not include any mark up or profit. Bit 9 paid these invoices in full.

34.     The first Croatian Developer engaged by Bit9, through VEUS, was Natko Kalisnik ("Kalisnik"). Kalisnik was engaged in June, 2006.

35.     On or about June 1, 2006, VEUS and Kalisnik entered into an agreement concerning the terms and conditions of the relationship between VEUS, Kalisnik, and Bit9. A true and accurate copy of this agreement is attached hereto as Exhibit A.

36.     The agreement executed between VEUS and Kalisnik and delivered by VEUS to Bit9 explicitly provided that "Bit9 Inc. will retain exclusive ownership of all technology developed under this relationship." See Exhibit A.

6

37. Over the next eighteen months, additional Croatian Developers were engaged by Bit9 through VEUS. VEUS and these Croatian Developers executed an agreement substantively identical to the agreement executed by Kalisnik and delivered these agreements to Bit9.

38. VEUS delivered to Bit9 the agreements signed by Kalisnik and the other Croatian Developers to evidence and memorialize the parties' agreement that all intellectual property rights in the work performed by the Croatian Developers belonged to Bit9.

39. Prior to 2009, neither VEUS nor any of the Croatian Developers ever claimed or suggested that they, and not Bit9, held any ownership interest or any intellectual property rights in any software code.

40. In addition, during 2008, VEUS and Bit9 had some discussions and negotiations about other business terms, particularly the allocation of responsibility for an office lease and for severance payments required under Croatian law in the event the Croatian Developers were terminated.

41. During those discussions and negotiations, VEUS acknowledged that Bit9 owned all of the intellectual property rights in the software code developed by the Croatian Developers. VEUS never claimed or suggested that it held any rights to that code.

42. In February 2009, during the negotiations between Bit9 and VEUS, VEUS asked for the first time for a "management fee" from Bit9.

Bit9 Learns of VEUS' Fraudulent Overcharging and Seeks to End the Relationship

43. In July 2009, one of the Croatian Developers working for Bit9 through VEUS contacted Bit9 and requested an increase in his salary. At this time it became evident to Bit9 that it was paying VEUS significantly more than VEUS was, in turn, paying the Croatian Developers.

44. Prior to this time, Bit9 understood and believed – because VEUS and Mario had expressly represented – that all of the money Bit9 paid to VEUS was being passed along as salary to the Croatian Developers or was being used to pay for any computer or other equipment bought to support their work or for any overhead costs associated with their employment, pursuant to Bit9's agreement with VEUS.

45. Through further investigation, Bit9 learned that VEUS had been fraudulently charging Bit9 a significant mark-up on the amounts that VEUS was paying to the Croatian Developers.

46. VEUS was charging this substantial mark-up despite the parties' express agreement, despite VEUS and Mario's express representations, and without Bit9's knowledge or consent.

47. Upon information and belief, Mario was fully aware that VEUS, the company owned and controlled by his father, had been fraudulently overcharging Bit9.

48. In August 2009, after VEUS learned that Bit9 intended to end the parties' relationship, VEUS claimed, for the first time, that it owned the rights to the software code written by the Croatian Developers.

49. On or about September 17, 2009, Bit9 informed VEUS that it was terminating the parties' relationship.

50. In a transparent effort to extort and shake down Bit9, VEUS demanded that Bit9 grant it an equity ownership interest in Bit9 in return for dropping its claim to the intellectual property rights in the software code.

### Mario's Breach Of His Contractual Obligations And Fiduciary Duties To Bit9

51. During his entire tenure of employment by Bit9, Mario was responsible for reviewing the invoices submitted to Bit9 by VEUS. In fact, Mario was responsible for approving VEUS invoices until early-2008.

52. On or about December 31, 2008, after more than three years of employment, during which time he managed the business relationship between Bit9 and VEUS, Mario's employment with Bit9 ended.

53. On or about May 23, 2005, as a condition of employment by Bit9, Mario executed a Confidentiality, Non-Disclosure, Non-Competition and Developments Agreement (the "Confidentiality Agreement") between him and Bit9. A true and accurate copy of the Confidentiality Agreement is attached hereto as Exhibit B.

54. In Section 2(c) of the Confidentiality Agreement, Mario expressly agreed that he was obliged to keep confidential and not to disclose Bit9's proprietary and confidential information. See Exhibit B, Section 2(c).

55. In addition, Mario agreed, in Section 6 of the Confidentiality Agreement, that he would not engage in competition with Bit9 for a period of one (1) year after the end of his employment at Bit9. See Exhibit B, Section 6.

56. At the time his employment with Bit9 ended, Mario executed a Separation Form on or about December 15, 2008 in which he acknowledged the validity and continued applicability of the Confidentiality Agreement. A true and accurate copy of the Separation Form is attached hereto as Exhibit C.

57. Since leaving the employ of Bit9, Mario disclosed and continues to disclose Bit9's confidential information to VEUS.

58. In fact, Mario has been and, upon information and belief, continues to be the primary source of information to VEUS in connection with this dispute.

59. Mario has, therefore, upon information and belief, been engaged directly with VEUS and is thus acting in direct competition with Bit9.

60. Further, upon information and belief, Mario has formed a new software entity in the United States, [removed "direct competition" language] and is employing a team of Croatian Developers who had previously been engaged by Bit9.

61. Upon information and belief, Mario has employed these former-Bit9 Croatian Developers through VEUS. Upon information and belief, these former-Bit9 Croatian Developers are using, without authorization, computer equipment that belongs to Bit9.

## COUNT I

### Breach of Contract – VEUS

62. Bit9 restates and re-alleges all of the allegations contained in Paragraphs 1 through 61 as if fully set forth herein.

63. VEUS entered an express agreement with Bit9 to provide computer programming services to Bit9 using the Croatian Developers, to charge Bit9 at cost and without markup, and to transfer and ensure that Bit9 owned all of the intellectual property rights in any software code or developments created during the course of their relationship, among other terms.

64. VEUS and Bit9 entered into this agreement knowingly and intending to be bound.

65. The agreement was clear and definite in all of its material terms, supported by consideration, and constitutes a valid and binding contract that is fully enforceable by Bit9.

66. Bit9 has fulfilled all of its obligations under the agreement with VEUS, and there are no conditions precedent to VEUS obligations that remain unsatisfied.

67. By the conduct described in this Complaint, VEUS materially breached its contracts with Bit9.

68. VEUS' material breaches have caused Bit9 to sustain significant monetary damages, in an amount not yet fully determined.

69. VEUS' material breaches have also caused irreparable harm and damage to Bit9, and those breaches will continue to cause irreparable harm. Bit9 has no adequate remedy at law for VEUS' breaches, and the harm that Bit9 has sustained cannot be fully measured or valued entirely in terms of money damages.

## COUNT II

### Conversion – VEUS

70. Bit9 restates and re-alleges all of the allegations contained in Paragraphs 1 through 69 as if fully set forth herein.

71. VEUS has no ownership interest in the computer equipment and computer code created by the Croatian Developers engaged and paid by Bit9.

72. VEUS has intentionally and wrongfully exercised acts of ownership, control and dominion over Bit9's personal property, including both the computer equipment and the computer code.

73. Bit9 has the right of immediate possession of its personal property.

74. Bit9 has been and continues to be damaged by VEUS' conversion of its personal property.

## COUNT III

### Fraud – VEUS

75. Bit9 restates and re-alleges all of the allegations contained in Paragraphs 1 through 74 as if fully set forth herein.

76. When the parties' entered their contractual relationship, VEUS expressly represented and agreed that it would charge Bit9 only for the costs it incurred in engaging the Croatian Developers, without any profit or markup.

77. Each time that VEUS submitted an invoice for payment to Bit9, VEUS represented that the amount on the invoice represented only the actual costs VEUS had incurred in engaging the Croatian Developers, without any profit or markup.

78. VEUS' representations about the amount of the invoices were representations of material fact.

79. VEUS made these representations knowingly and with the intent that Bit9 rely upon them.

80. Bit9 did, in fact, reasonably rely on VEUS' representations, to its detriment, by paying the invoices in full.

81. VEUS' representations about the amount of the invoices were false, as it was charging Bit9 substantially more than VEUS was paying the Croatian Developers.

## COUNT IV

### Violations of M.G.L. c. 93A – VEUS

82. Bit9 restates and re-alleges all of the allegations contained in Paragraphs 1 through 81 as if fully set forth herein.

83. Bit9 is engaged in the conduct of trade and commerce.

84. VEUS is engaged in the conduct of trade and commerce.

85. VEUS has engaged in unfair, deceptive, and unlawful acts and unfair methods of competition in violation of M.G.L. c. 93A, §§ 2 and 11 by, among other things, fraudulently charging Bit9 an unauthorized and excessive mark-up on the services it provided to Bit9 and by fraudulently claiming an ownership interest in computer code that is, by agreement between VEUS and Bit9, the exclusive property of Bit9.  VEUS has also deliberately interfered with Bit9's actual and prospective business relationships.

86. VEUS has willfully and knowingly engaged in these unfair methods of competition and these unfair, deceptive and unlawful acts and practices.

87. Bit9 has been and continues to be damaged by VEUS' willful and knowing malfeasance and is entitled to an award of actual damages, multiple damages, and attorney's fees.

## COUNT V

### Declaratory Judgment – VEUS and Mario Vuksan

88. Bit9 restates and re-alleges all of the allegations contained in Paragraphs 1 through 87 as if fully set forth herein.

89. At all times, Bit9 has held sole and exclusive ownership to the copyrights in the Parity and GSR software.

90. The copyrights in all versions of Parity and GSR have been duly registered by Bit9 and the United States Copyright Office is in the process of assigning them registration numbers.

91. VEUS and Mario have repeatedly claimed, in writing, that VEUS and/or Mario own rights in the Parity and GSR software code, and have threatened to file suit against Bit9 in connection with the ownership of that code.

92. An actual controversy exists as to the ownership of Bit9's copyrighted Parity and GSR code.

93. Bit9 is entitled to a declaration that it is the sole and exclusive owner of the copyrights and other intellectual property rights in the Parity and GSR software code, and that VEUS and/or Mario have no right, title, or interest in these copyrights or software code.

94. In addition to a declaratory judgment, Bit9 is entitled to such other and further relief as may be available and just, including, but not limited to, injunctive relief.

## COUNT VI

Breach of Contract – Mario Vuksan

95. Bit9 restates and re-alleges all of the allegations contained in Paragraphs 1 through 94 as if fully set forth herein.

96. The Confidentiality Agreement between Mario and Bit9 is a contract binding upon both parties to it.

97. Since his termination from Bit9, Mario has, upon information and belief, disclosed Bit9's confidential information to VEUS.

98. By this conduct, Mario has materially breached Section 2 of the Confidentiality Agreement by disclosing to VEUS Bit9's confidential and proprietary information.

99. Mario has also materially breached Section 6 of the Confidentiality Agreement by engaging in competitive activities through VEUS less than one (1) year after the cessation of his employment at Bit9, and by, upon information and belief, forming a new software entity in the

United States [removed "direct competition" language] that is employing a team of Croatian Developers who had previously been engaged by Bit9 and using, without authorization, computer equipment that belongs to Bit9.

100. As a result of Mario's material breaches of the Confidentiality Agreement, Bit9 has been and continues to be damaged.

## COUNT VII

### Breach of Fiduciary Duties – Mario Vuksan

101. Bit9 restates and re-alleges all of the allegations contained in Paragraphs 1 through 100 as if fully set forth herein.

102. As a result of his employment by Bit9, Mario owed fiduciary duties of loyalty to Bit9.

103. During his entire tenure of employment by Bit9, Mario was responsible for reviewing the invoices submitted to Bit9 by VEUS. In fact, Mario was responsible for approving VEUS invoices until early-2008.

104. Upon information and belief, Mario was aware that his father's company, VEUS, was surreptitiously and fraudulently overcharging Bit9 for the services provided by the Croatian Developers.

105. Despite this knowledge, Mario failed to inform Bit9 of the fraud and permitted the fraud to continue.

106. Mario's conduct constitutes a breach of his fiduciary duties to Bit9.

107. Bit9 has been damaged as a result of Mario's breaches of his fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Bit9 respectfully requests as follows:

a. With respect to Counts I through III, that judgment enter in favor of Bit9 against VEUS and that Bit9 be awarded actual damages in an amount to be proven at trial, plus costs and reasonable attorney's fees;

b. With respect to Count IV, that judgment enter in favor of Bit9 and against VEUS, that Bit9 be awarded its actual damages, trebled on account of VEUS' willful violations of Chapter 93A, plus its costs and attorneys' fees;

c. With respect to Count V, a declaration that Bit9 is the sole and exclusive owner of the copyrights and other intellectual property rights in the Parity and GSR software code, and that VEUS and/or Mario have no right, title, or interest in these copyrights or software code;

d. With respect to Counts VI and VII, that judgment enter in favor of Bit9 against Mario and that Bit9 be awarded actual damages in an amount to be proven at trial, plus costs and reasonable attorney's fees;

e. With respect to Count VI, that preliminary and permanent injunctive relief be entered to prevent Mario from continuing to violate his Confidentiality Agreement;

f. With respect to Count VII, that Mario be ordered to forfeit any and all compensation received from Bit9 during the period of his disloyalty; and

g. Such further relief as this Honorable Court deems proper and just.

## JURY DEMAND

Bit9 demands a trial by jury on all claims so triable.

        Respectfully submitted,

        **BIT9, INC.**,

        By its attorneys,

        */s/ Edward J. Naughton*
        Edward J. Naughton (BBO #600059)
        enaughton@brownrudnick.com
        Matthew P. Sgro (BBO #655825)
        msgro@brownrudnick.com
        BROWN RUDNICK LLP
        One Financial Center
        Boston, MA 02111
        Telephone: 617-856-8200
Dated:  October 26, 2009        Fax: 617-856-8201

\# 1703008 v3